**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

ADAM HUBACZ                         :
                                    :
                  Plaintiff,        :
                                    :    Case no. 2:12-cv-39
        v.                          :
                                    :
TODD PROTZMAN, WILLIAM SHEPELUK, :
JOBY FECCIA, THOMAS KELLY, the      :
VILLAGE of WATERBURY, VERMONT,      :
and the WATERBURY POLICE            :
DEPARTMENT                          :
                                    :
                  Defendants.       :
                                    :

## Opinion and Order

This action stems from Plaintiff Adam Hubacz's employment
and termination as a police officer for the Village of Waterbury
Police Department.  Hubacz's First Amended Complaint ("FAC" or
the "Complaint") raises a total of thirteen counts against the
Village of Waterbury, Vermont (the "Village" or "Waterbury");
the Waterbury Police Department ("WPD"); Vermont State Police
Detective Sergeant Todd Protzman; State's Attorney for
Washington County, Thomas Kelly; Waterbury Village Manager,
William Shepeluk; and Waterbury Police Chief, Joby Feccia.  The
Village, the WPD, Chief Feccia, and Shepeluk (collectively, the
"Municipal Defendants") filed a joint motion to dismiss all of
the counts pertaining to them; however, they have retracted that
motion with respect to Counts V, VIII, and XII in their reply

memorandum.  *See* ECF No. 36 at *4-7.  Defendants Protzman and Kelly have also filed a joint motion to dismiss the counts pertaining to them.

Pursuant to the Municipal Defendants' partial withdrawal of their motion Counts VIII and X against Waterbury and Count XII against Feccia remain.  The Court grants the Municipal Defendants' motion to dismiss except with respect to Count V (tortious interference) against Feccia and Shepeluk and Count VI (defamation) against Shepeluk.  The Court also grants Protzman and Kelly's motion to dismiss in full.

## BACKGROUND

The following facts are taken from the Complaint.  Officer Hubacz joined the WPD in February 2009 and became a full-time officer in May 2009.  FAC ¶ 45.  For the duration of his time at the WPD, Hubacz reported to Chief Feccia.  In 2009, Hubacz received a full-tuition scholarship to attend the National Forensics Academy in Tennessee; however Feccia and Waterbury Village Manager William Shepeluk refused to grant him the ten weeks of unpaid leave he needed to attend.  *Id.* ¶ 51.  After being denied that opportunity, Hubacz also became uncomfortable working in the Department because of the behavior of some of its officers, including Feccia.  Hubacz learned of several instances in which WPD officers engaged in inappropriate conduct, such as stealing evidence from a liquor control investigation and

maintaining improper workplace relationships.  *Id.* ¶¶ 54-56, 62-63.

In August 2010, Hubacz applied to the Montpelier Police Department ("MPD") and interviewed with the head of that force, Chief Tony Facos.  *Id.* ¶ 67.  During the interview, Hubacz explained that he had serious concerns about the integrity of employees at the WPD.  *Id.* ¶ 71.  Though Facos mentioned that there was a tacit agreement among Vermont police chiefs not to hire officers from other departments who had been on the job less than three years, Facos nonetheless made Hubacz a tentative offer as an officer at the MPD pending a background check and physical fitness test.  *Id.* ¶¶ 72, 75.  Less than two weeks later, Facos called Hubacz to rescind the offer and, during a later conversation in person, acknowledged that Feccia had reminded him of the police chiefs' agreement not to "steal" new hires.  FAC ¶ 93.  Hubacz also alleges that Shepeluk called his counterpart in Montpelier, the City Manager, to stop Hubacz from securing a position there. *Id.* ¶¶ 87-89.

In December 2010 or January 2011, Hubacz met with Thomas Kelly, the State's Attorney for Washington County, Vermont.  *Id.* ¶ 104.  Hubacz described his issues with the WPD as well as his failed attempt to move to the MPD.  Kelly advised Hubacz to leave the WPD but took no further action.  In January or February 2011, Hubacz met with Shepeluk twice to discuss his

problems with the WPD, but Shepeluk also took no action. *Id.* ¶¶ 107, 109.  In early 2011, Hubacz set out to organize the Waterbury Police Patrolmen's Union, Local 402, which certified with the New England Police Benevolent Association, Inc. *Id.* ¶ 113.  The union's goals were to establish uniformity in the treatment of officers by their commanders, standards for physical fitness and officer discipline, and the consistency and uniformity of raises within the Department. *Id.* ¶ 117.

In May 2011, Hubacz learned of possible budget cuts at the WPD and applied for jobs with the Saint Albans Police Department ("SAPD") and the City of South Burlington Police Department ("SBPD").  FAC ¶¶ 117, 120.  Applicants to the SAPD must take a polygraph examination to be considered, and on April 19, 2011, Hubacz traveled to the Williston barracks of the Vermont State Police ("VSP") to receive the exam. *Id.* ¶ 128.  VSP Detective Sergeant Todd Protzman, an authorized polygraph examiner, was assigned to administer Hubacz's examination. *Id.* ¶ 129. Protzman began by conducting a pre-test interview to gain some preliminary information to use as control questions for the polygraph test.  Protzman explained to Hubacz that he could refuse to answer any questions but that his refusal to do so would prevent the examination from proceeding. *Id.* ¶ 145. Protzman further instructed Hubacz that "I don't know" and "I don't remember" were unacceptable responses and advised him that

admitting to all illegal activity and erring on the side of disclosure would help him pass his test.  *Id.* ¶¶ 153, 155.

Protzman proceeded to ask Hubacz a series of questions covering a wide range of topics, including Hubacz's marital status, past psychological treatment, use of illegal drugs, sexual misconduct[1], mental health, association with people who have been convicted of crimes or who advocate the overthrow of any governments, and his financial status.  *Id.* ¶ 140.  After three and a half hours of questioning, Protzman stopped for a break, during which he contacted the SAPD.  FAC ¶ 162.  Almost an hour later, Protzman returned and informed Hubacz that he had spoken with SAPD Chief Gary Taylor who had directed him to discontinue the interview without conducting a polygraph examination.  *Id.* ¶ 167.  When Hubacz asked whether he had failed, Protzman explained, "No, it's not a 'fail.'  It's like the test never took place, and it didn't . . . ."  *Id.* ¶ 169.

After the interview, Protzman prepared a document entitled "Confidential Pre-Employment Polygraph Examination Report" (the "Report") and sent it to Taylor and South Burlington Police Chief Trevor Whipple.  *Id.* ¶ 179.  Protzman did not share the

---

[1] According to Hubacz, Protzman's questions focused mainly on illegal sexual activities, but Protzman also asked him "[t]o describe intimate details of his sexual activities, including the name and age of a particular woman."  FAC ¶ 140(S).

Report with Hubacz.  *Id*. ¶ 180.  The Report included the

following statements:

> The applicant advised that in October of 2010 he stole
> several police uniform items when left the North Brookfield
> Police Department.  He said he kept items including a hat,
> a badge and a short-sleeve shirt and he said they were used
> items that part-time officers were permitted to use on
> duty.
>
> * * * *
>
> The applicant advised that in about February of 2011 he
> submitted a fraudulent insurance claim to his insurance
> company, Liberty Mutual Insurance Company.  He said he had
> to have his vehicle towed and the tow operator wrote the
> bill for $10.00 more than the actual charge.  The applicant
> said he knowingly submitted the inflated bill to his
> insurance company and he subsequently kept the extra
> $10.00.
>
> * * * *
>
> The applicant advised that in the past he occasionally
> represented himself to be a police officer when he had no
> legal right to do so.  He said he did this several times to
> avoid having to pay a cover charge at clubs.  He said he
> also did this to obtain a hotel discount. He said he also
> did this in high school when interacting with drug users,
> to see their reaction.
>
> * * * *
>
> The applicant advised that in 2009 while attending the
> Vermont Police Academy he cheated on a Motor Vehicle test.
> He said he failed the test a couple of times and then
> cheated during a re-test, by asking another student for
> information during the test.

*Id.* ¶ 182.  Both the SAPD and SBPD stopped considering Hubacz's application when learning of this information.[2]  FAC ¶¶ 175, 188. On information and belief, Hubacz claims that Feccia obtained a copy of the Report from Protzman as well as a DVD recording of the interview, forwarded a copy of the Report to Kelly, and forwarded copies of both to Shepeluk.  *Id.* ¶¶ 195-96, 199-200.

On Friday, June 10, 2011, Hubacz received notice of a potential disciplinary action against him and on June 15, 2011 was notified by a union representative that the action was related to his pre-polygraph interview.  *Id.* ¶¶ 202-04.  The Village held a disciplinary hearing on June 20, 2011.  *Id.* ¶ 205.  Even though he had yet to receive a copy of the Report, Hubacz addressed the statements he made in the pre-polygraph interview.  *Id.* ¶ 211.  Hubacz explained that he sometimes showed his badge to get reduced rates on hotels or to enter clubs for free.  *Id.* ¶ 214.  He also explained that he had notified the chief of the North Brookfield Massachusetts Police Department about the uniforms he had taken and that the chief had told him not to worry about it.  FAC ¶ 216.  Hubacz noted that the $10 overpayment by the insurance company was due to a misunderstanding between him and a tow truck operator and that he had returned the money to the insurance company.  *Id.* ¶ 216.

---

[2] According to the Complaint, SAPD learned of Hubacz's statements when Protzman called Taylor immediately after the pre-polygraph interview. FAC ¶ 162.

Finally, Hubacz declared that he had not cheated on an exam at the Vermont Police Academy and that any statement to the contrary during the pre-polygraph interview was mistaken and a result of his faulty recollection. *Id.* ¶ 219.

The hearing was continued to the first week of August 2011, whereupon Shepeluk informed Hubacz that the alleged uniform theft was not an issue, that they would not be prosecuting him for the $10 overpayment from the insurance company, and that an in-depth investigation—including calls to Hubacz's former classmates at the Academy—revealed no evidence of the alleged cheating. *Id.* ¶ 245. However, Shepeluk did inform Hubacz that he and Feccia wanted to punish Hubacz for damaging the reputations of other WPD officers and employees by criticizing them. *Id.* Hubacz accepted the loss of seven days of paid vacation time as a punishment. *Id.* ¶ 250.

That resolution was short lived. On or about September 5, 2011, Kelly notified Feccia that he had decided not to accept any more cases from Hubacz for prosecution. *Id.* ¶ 258. A few days later on September 9, Kelly sent out at least 23 copies of a redacted version of the pre-polygraph Report to members of the Vermont criminal defense bar and to *pro se* criminal defendants. FAC ¶ 259. Kelly also sent copies of the redacted and unredacted Report to Cindy Maguire, Esq. at the Vermont Attorney General's Office and to Feccia. *Id.* ¶ 262-63. In each of the

letters, Kelly described the document as a "report of a pre-employment polygraph." *Id.* ¶¶ 261, 267. Kelly did not inform Hubacz directly of any of these actions until Hubacz called him on September 29, 2011. On Saturday, October 1, 2011, Shepeluk and Feccia presented Hubacz with a proposed severance agreement, *id.* ¶ 297, and Feccia also requested that Hubacz turn in his gun, which he did. *Id.* ¶ 302. That day proved to be Hubacz's last in uniform for the WPD. *Id.* ¶ 303. Later in October, Hubacz rejected the severance agreement. FAC ¶ 312.

On January 9, 2012, Shepeluk sent Hubacz a two-page letter notifying him that he was being placed on paid administrative leave, that the Village would be considering taking action against him on January 11, 2012, and that Shepeluk and Feccia were recommending that he be terminated. *Id.* ¶¶ 319-22. The hearing was rescheduled for January 24, 2012 by consent of the parties. At the beginning of the hearing, the Attorneys for Hubacz and the Village stipulated "that the sole basis for the Village's request for termination would be that Washington County State's Attorney Thomas Kelly had decided that his office would no longer prosecute a case involving Officer Hubacz." *In re Adam Hubacz*, at *1 (Village of Waterbury, Jan. 27, 2012), ECF No. 27-18. At the hearing, Shepeluk and Feccia testified that Hubacz could not fully perform his duties if Kelly would not prosecute Hubacz's cases but acknowledged that Hubacz had done a

fine job on the WPD.  FAC ¶ 346-47.  At the conclusion of the hearing, Hubacz's counsel filed an eight-page Motion to Dismiss the notice of charges on the grounds that it: (1) failed to allege Hubacz had become negligent or derelict in his official duty, or that he was guilty of conduct unbecoming an officer; (2) was not based on Shepeluk's "own knowledge"; (3) was not based on a "written petition"; and (4) was facially defective because even if it was considered a "written petition," it failed to allege that he was negligent or derelict in his duty or was guilty of conduct unbecoming an officer.  *Id.* ¶ 349. Hubacz also argued that as a State's Attorney, Kelly did not have the authority to fashion parameters to put a police officer out of a job.  *Id.* ¶ 351.  After a brief executive session, the Village trustees announced that they would take the matter under advisement and render a decision at a future date.  *Id.* ¶ 357. A day after the hearing, Feccia released the redacted Report to news outlets.  *Id.* ¶ 358-360.

On January 27, 2012, the Village issued a 13-page decision finding that Hubacz had become negligent and derelict in his duties and terminating his employment under Vt. Stat. Ann. tit. 27, § 1932.  FAC ¶ 373.  The Village offered three grounds for its decision.  First, the Village explained that Kelly's decision not to prosecute any of Hubacz's cases meant that Hubacz would be unable to perform his duties as a village police

officer, which include "prosecuting and testifying in criminal cases." *In re Adam Hubacz*, at *8.  Second, the Village reasoned that Hubacz's inability to participate in his police work would destroy public respect for the department and that he was therefore also guilty of conduct unbecoming a police officer. *Id.* at *9.  Finally, the Village noted that "[u]nder Vermont law, Section 1932 is the only mechanism for a town or village to dismiss a police officer who cannot function but will not resign." *Id.*  For that reason, the Village suggested that as a practical matter, the intent behind Section 1932 could not have been to require a higher standard for dismissal, such as proof of willful misconduct.

Hubacz filed his first complaint in this action on February 27, 2012.  Hubacz now lives in Massachusetts.  *Id.* ¶ 431.

## DISCUSSION

On a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir. 2010).  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual

11

matter ... to 'state a claim to relief that is plausible on its
face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is
facially plausible "when the plaintiff pleads factual content
that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." *Id.* (citing
*Twombly*, 550 U.S. at 556). This requires a plaintiff to show
"more than a sheer possibility that a defendant has acted
unlawfully." *Id.*

## I.    The Claims Against the WPD Are Dismissed

The Municipal Defendants first argue that the WPD does not
have the capacity to be sued and therefore should be dismissed
from counts in which it is named (V, VII, IX, X, and XIII).
Rule 17(b)(3) of the Federal Rules of Civil Procedure requires
district courts to consult state law where they are located to
determine a defendant's capacity to be sued. In the absence of
any Vermont statutes or case law on the matter, this Court has
"consistently held that police departments in Vermont do not
have the capacity to be sued." *O'Brien v. Barrows*, No. 10-cv-
173, 2010 WL 5300812 at *2 (D. Vt. Dec. 22, 2010) (citing *Gorton
v. Burlington Police Dep't*, 23 F. Supp. 2d 454, 456 (D. Vt.
1998); *see also Hee v. Everlof*, 812 F. Supp. 1350, 1351 (D. Vt.
1993). Hubacz argues that *Franklin County Sheriff's Office v.
St. Albans City Police Dept.*, 2012 VT 62, ¶ 7, 58 A.3d 207, 211,
compels a different result, but the Vermont Supreme Court did

not squarely address the issue in that case.  Instead, the
Vermont Supreme Court merely affirmed without comment the lower
court's finding that a municipal department could sue or be sued
*when it enters the marketplace as a seller*.  *Id.*  Accordingly,
this Court sees no reason to reconsider its ruling in *O'Brien*,
and all claims against the WPD are therefore dismissed.

## II.  The Claims Against Kelly Are Dismissed

In Counts IV and XII, Hubacz claims that Defendant Kelly
violated his constitutional rights to privacy, freedom of
speech, freedom of association, and due process in violation of
42 U.S.C. § 1983 by deciding not to prosecute cases Hubacz
prepared, communicating that decision to Feccia, sending the
Report to members of the defense bar in cases where Hubacz might
be a witness, notifying Protzman and Assistant Attorney General
Cindy Maguire of those disclosures, and stating that he would
inform any of Hubacz's prospective law enforcement employers
about the Report.  Kelly asserts that he is entitled to absolute
prosecutorial immunity or qualified immunity for all of these
actions and also that with respect to Count XII, Hubacz has
failed to state a valid claim for a false and stigmatizing
statement.

Kelly is protected by absolute prosecutorial immunity for
most of the conduct Hubacz identifies.  Absolute immunity
attaches to actions associated with the judicial phase of the

13

criminal process, including the decision of whether or not to initiate criminal prosecution. *Schloss v. Bouse*, 876 F.2d 287, 289 (2d Cir. 1989); *see also Imbler v. Pachtman*, 424 U.S. 409, 427 (1976). This includes any conduct that could "fairly be characterized as closely associated with the conduct of litigation or potential litigation." *Barrett v. United States*, 798 F.2d 565, 572 (2d Cir. 1986). Although the Second Circuit has not addressed the issue, both the First and Ninth Circuits have extended absolute immunity to a prosecutor's categorical decision not to pursue all matters involving a particular police officer. *See Roe v. City & County of San Francisco*, 109 F.3d 578, 584 (9th Cir. 1997); *Harrington v. Almy*, 977 F.2d 37, 42 (1st Cir. 1992). The Vermont Supreme Court has done the same for state claims. *See O'Connor v. Donovan*, 2012 VT 27, ¶ 23, 48 A.3d 584, 592. Because the decision not to prosecute cases, even when done on a wholesale basis, falls within the core discretion absolute prosecutorial immunity is meant to protect, it applies to Kelly's decision in this case.

Kelly's disclosure of the Report to defense counsel in pending cases involving Hubacz is also closely related to the conduct of litigation, as was his decision to notify Protzman and Assistant Attorney General McGuire. Although the existence of a legal or ethical obligation is not a condition precedent for absolute immunity, it is quite likely that Kelly's

14

disclosures to defense counsel were required under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and related ethics requirements.  Even if Kelly was not somehow obligated to make the disclosures, his decision to share the redacted Report was directly related to pending litigation, and Kelly's notification of McGuire, his superior, and Protzman, the author of the report, only served to facilitate the State's response to potential questions about the Report.  Because Kelly's disclosures were intimately connected to the conduct of litigation, absolute prosecutorial immunity extends to those actions as well.

Kelly is also entitled to qualified immunity to the extent some of his actions are not protected by absolute immunity. *Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006) ("[A] government attorney is entitled only to qualified immunity when functioning in an administrative or investigative capacity."). The Supreme Court has mandated a two-step inquiry for resolving government officials' qualified immunity claims:

> First, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right.  Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations omitted).  The fundamental question is "whether pre-existing law from this and other circuits makes it 'apparent,' or provides officers with 'fair warning,' that the specific conduct in question is unlawful." *Towsley v. Frank*, 5:09-CV-23, 2010 WL 5394837 at *11 (D. Vt. Dec. 28, 2010) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Scott v. Fischer,* 616 F.3d 100, 105 (2d Cir. 2010) (explaining that courts may rely on precedent from other circuit courts of appeals in deciding that a right is clearly established and denying qualified immunity).

Here, Hubacz has not met even the initial burden of pleading facts giving rise to a "stigma-plus" due process claim against Kelly, much less one that is premised on clearly established law.  "To establish a 'stigma plus' claim, a plaintiff must show (1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'" *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)).  Hubacz does not identify any statement Kelly made that damaged Hubacz's reputation and is capable of being proven false.  While it is

true that the Report may have damaged Hubacz's reputation, Hubacz does not dispute its accuracy.  Hubacz instead points to the fact that Kelly mistakenly referred to the Report as a "pre-employment polygraph report" rather than a report of a pre-polygraph interview, but to the extent that that characterization qualifies as a "statement," it was not stigmatizing.  *See id*. (noting that a false statement must be "sufficiently derogatory to injure [a plaintiff's] reputation").

For these reasons, all of the claims against Kelly are dismissed.

### III. The Claims Against Protzman Are Dismissed

#### A.   Count I Fails to State a Claim Against Protzman for the Deprivation of Any Clearly Established Constitutional Rights

In Count I, Hubacz alleges that Protzman deprived him of his constitutional rights to informational privacy, freedom of speech, freedom of association, and due process in violation of 42 U.S.C. § 1983.  Protzman argues that Hubacz has failed to state a valid claim for relief under any of these theories and that qualified immunity also shields him from suit.

Protzman, like Kelly, is entitled to qualified immunity for his official actions.  As explained above, Hubacz therefore has the burden of pleading facts showing a violation of a constitutional right and demonstrating that the right was clearly established.  *Pearson v. Callahan*, 555 U.S. 223, 232

17

(2009); *see also McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir. 1997) ("A defendant pleading qualified immunity on a motion to dismiss is entitled to prevail if the allegations in the complaint fail to 'state a claim of violation of clearly established law.'") (quoting *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)).

### 1.   Informational Privacy

In 1977, the Supreme Court decided two cases that referred broadly to a constitutional privacy interest in avoiding the disclosure of personal matters. *See Whalen v. Roe*, 429 U.S. 589, 599–600 (1977); *Nixon v. Administrator of General Servs.*, 433 U.S. 425, 457 (1977). More recently, in *NASA v. Nelson*, 131 S. Ct. 746, 751 (2011), the Court assumed without deciding that a job-related background investigation could implicate a government employee's constitutional privacy rights; nonetheless, the Court recognized that the government was entitled to conduct "reasonable, employment-related inquiries" of job applicants and employees. *Id.* at 759. For that reason, the Court explained, it is permissible for the government to seek information bearing on suitability for employment or security clearance, including honesty, trustworthiness, financial integrity, substance abuse, general behavior or conduct, and legal violations. *Id.* at 161.

Hubacz relies principally on *Thorne v. City of El Segundo*, 726 F.2d 459, 468-69 (9th Cir. 1983), a case in which the Ninth Circuit applied a form of intermediate scrutiny to a police department's use of a mandatory polygraph examination to inquire into an applicant's sex life. *Id*. at 469 ("[T]he City must show that its inquiry into appellant's sex life was justified by the legitimate interests of the police department, that the inquiry was narrowly tailored to meet those legitimate interests, and that the department's use of the information it obtained about appellant's sexual history was proper in light of the state's interests."). While most of the questions Protzman asked are at least theoretically relevant to Hubacz's qualifications as a police officer because they bear on whether he has committed any crimes, Protzman strayed further from relevance when he asked Hubacz "[t]o describe intimate details of his sexual activities, including the name and age of a particular woman." FAC ¶ 140(S). That said, the particular circumstances of this case are distinguishable from those in *Thorne*: the potentially offending questions here were asked during a pre-polygraph interview, not during the polygraph itself, *see Hester v. City of Milledgeville*, 777 F.2d 1492, 1497 (11th Cir. 1985) (recognizing that "[t]he city's interest in using control questions to improve the accuracy of the polygraph testing is an important one"), and Hubacz's responses were also protected from

19

public disclosure by Vt. Stat. Ann. tit 1, § 317(c)(7)[3], which helps allay his privacy concerns.  *See Nelson*, 131 S. Ct. at 761 ("'[S]tatutory or regulatory duty to avoid unwarranted disclosures' generally allays these privacy concerns.").

The major obstacle for Hubacz's informational privacy claim against Protzman, though, is showing that Protzman's conduct violated clearly established law.  Hubacz must show that a reasonable officer would have understood that what he was doing violated Hubacz's right to informational privacy.  *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Meeting that standard "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Id*.  Though *Thorn* provides support for Hubacz's claim, it was decided nearly two decades before *Nelson*, and the legal contours of the right to informational privacy are hardly beyond debate, particularly in the context of questions asked in conjunction with an individual's application to a police force.  In the Second Circuit, the most clear guidance on the issue is that there is no constitutional violation unless the information released is "highly personal"

---

[3] That provision exempts from disclosure "personal documents relating to an individual, including information . . . maintained to hire, evaluate, promote, or discipline any employee of a public agency, information in any files relating to personal finances, medical or psychological facts . . . ."  *Id.*

in nature; however, that language was borrowed from the particular law at issue in the case and was not meant to establish the threshold for a constitutional informational privacy claim.  *Barry v. City of New York*, 712 F.2d 1554, 1562 (2d Cir. 1983).  Because an officer would not have been on reasonable notice that a question about Hubacz's sexual conduct would have violated Hubacz's constitutional right to informational privacy, this claim against Protzman is dismissed.

### 2.  Freedom of Speech

Hubacz also claims that Protzman violated his First Amendment right to free speech by retaliating against him for engaging in protected speech and by compelling him to engage in speech during the pre-polygraph interview.  Upon inspection, the Court finds that Hubacz has failed to state a valid claim for relief under either theory.

"Whether public employee speech is protected from retaliation under the First Amendment entails two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  Here, Hubacz has failed to allege facts providing a plausible basis to

21

get past the first inquiry.  Hubacz's statements to Protzman took place in preparation for a polygraph examination that was required for his application to the SAPD.  As such, his speech was not protected by the First Amendment because it involved matters of personal interest—namely, prospective employment—rather than public concern.  *Rao v. New York City Health & Hospitals Corp.*, 905 F. Supp. 1236, 1243 (S.D.N.Y. 1995) ("The fundamental question is whether the employee is seeking to vindicate personal interests or to bring to light a 'matter of political, social, or other concern to the community.'") (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)); *see also Mishk v. Destefano*, 5 F. Supp. 2d 194, 201 (S.D.N.Y. 1998) (finding that an individual's statements during an interview for a promotion did not "represent speech on a matter of public concern because their primary purpose was to increase his likelihood of promotion").

Hubacz also claims that he was compelled to speak, in violation of his First Amendment rights.  "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *Bd. of Educ. v. Barnette*, 319 U.S. 624, 633-634 (1943)).  On this ground, the Supreme Court has struck down laws compelling public school children to salute the

American flag, *see Barnette*, 319 U.S. at 642, requiring
motorists to use license plates bearing the motto "Live Free or
Die," *Wooley*, 430 U.S. at 717, and requiring a citizen or group
of citizens to subsidize speech with which they disagree.
*United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001).
Plaintiff here has not pleaded any facts giving rise to an
inference that he was forced to express certain views or to
subsidize speech to which he objects.  *See R.J. Reynolds Tobacco
Co. v. FDA*, 696 F.3d 1205, 1211 (2012).  Nor was his
participation in the pre-polygraph interview compelled by
Protzman or, for that matter, any other government official.
Hubacz made an entirely voluntary decision to apply to the SAPD,
and although taking a polygraph and undergoing a pre-polygraph
interview were mandatory components of that application process,
Hubacz had the option of refusing to answer the questions he
asked.  FAC ¶ 145.  Most significantly, the pressure Hubacz may
have felt to complete the interview (and subsequent polygraph
had it occurred) does not mean that he was compelled by Protzman
to provide the answers he did.[4]

For these reasons, Hubacz's free speech claim against
Protzman is dismissed.

### 3.   Freedom of Association

---

[4] In conjunction with his First Amendment arguments, Plaintiff raises
several cases involving Fifth Amendment Due Process issues.  That
claim is discussed separately below.

Hubacz further alleges that Protzman violated his right to freedom of association by simply asking him whether he had ever been a member of, donated to, or been contacted by an organization advocating the overthrow of any government. Hubacz relies on two cases, *Application of Stolar*, 401 U.S. 23, 30 (1971) and *Baird v. State Bar of Arizona*, 401 U.S. 1, 5 (1971), decided on the same day, in which a plurality of Supreme Court justices held that the First Amendment precluded both the District of Columbia and states from requiring an applicant for bar admission to disclose whether he or she has been or is a member of any organization advocating overthrow of the government.

Those decisions, of course, did not involve the state's authority as an employer. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti* 547 U.S. at 418; *see also Waters v. Churchill*, 511 U.S. 661, 671 (1994) ("[W]e have always assumed that its premise is correct-that the government as employer indeed has far broader powers than does the government as sovereign."). Nonetheless, courts have struck down requirements that public employees disclose all (or most) of their associations with outside organizations. *See, e.g., Shelton v. Tucker*, 364 U.S. 479, 490 (1960) (invalidating an Arkansas law requiring public school teachers to disclose the

24

names and addresses of all organizations to which they had belonged or contributed); *Am. Fed'n of Gov't Emp., R.R. Ret. Bd. Council, AFL-CIO v. United States R.R. Ret. Bd.*, 743 F. Supp. 450, 452-53 (N.D. Ill. 1990) (finding that questions asking employees to disclose their membership to all United States-based organizations except for labor unions and political and religious organizations violated the First Amendment); *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 120 (3d Cir. 1987) (directing the district court to enjoin use of a question on a police department's employment questionnaire requiring disclosure of positions or associations held by applicants, their spouses, and minor dependent children).  Questions targeting a specific type of organization have received more favorable treatment, *see, e.g., Young v. City of Louisville*, No. 92-6261 at *6, 7 F.3d 237 (6th Cir. Aug. 31, 1993) (unpublished) (finding that police department's questions about an applicant's affiliation with hate groups did not violate the right to freedom of association), and some courts, including the Second Circuit, have permitted the government to consider how the public might perceive associations of its police and firefighters when making employment decisions. *See, e.g., Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006); *cf. Tindle v. Caudell*, 56 F.3d 966, 971 (8th Cir. 1995) ("Because police departments function as

paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer.").

Qualified immunity again precludes Hubacz from moving forward with this claim.  Although it has been clearly established that a public employee's right to freedom of association prevents the government from inquiring about all of his or her associations, there is no clearly-established right preventing a government official from asking police officers (or applicants to become police officers) about their associations with anti-government groups.  In this case, Protzman only questioned Hubacz, a candidate to become a police officer, about his involvement with organizations that advocate overthrow of the government.  A reasonable officer in Protzman's position would not have reason to know that those questions violated a clearly established constitutional right.  Hubacz's freedom of association claim against Protzman is therefore dismissed.

### 4.   Due Process

Hubacz also asserts a "due process" claim against Protzman, but Hubacz has not been subject to any criminal proceedings, which precludes a due process claim on the grounds of self-incrimination.  *See Chavez v. Martinez*, 538 U.S. 760, 772-73 (2003) ("[T]he absence of a 'criminal case' in which Martinez

was compelled to be a 'witness' against himself defeats his core
Fifth Amendment claim."). In his reply brief, Hubacz explains
that this claim asserts that "Protzman's actions deprived [him]
of his substantive due process right to avoid public disclosure
of personal matters." Pl.'s Mem. Opp. Individual Defs.' Mot. to
Dismiss at *7, ECF No. 28. Thus framed, this claim is identical
to Hubacz's informational privacy claim, which is dismissed for
the reasons explained above.

### B. Count XIII Fails to State a Claim Against Protzman for Invasion of Privacy

Hubacz also raises a state tort claim for invasion of
privacy against Protzman for the questions he asked in the pre-
polygraph interview, for providing oral and written reports of
that interview to the SAPD, WPD, and SBPD, and for providing a
DVD of the interview to Chief Feccia. FAC ¶¶ 550-51. To state
a claim for invasion of privacy, a plaintiff must show "a
substantial, intentional intrusion upon the solitude or
seclusion of another, or upon his private affairs or concerns,
which would be highly offensive to a reasonable person." *Harris
v. Carbonneau*, 165 Vt. 433, 439, 685 A.2d 296, 300 (1996)
(citing the Restatement (Second) of Torts §§ 652A, 652B (1977)).
Alternatively, a plaintiff may show that the defendant gave
publicity to his or her private life if the matter publicized
"would be highly offensive to a reasonable person" and "is not

27

of legitimate concern to the public."  Restatement (Second) of Torts § 652D.

Hubacz has failed to state a claim against Protzman for invasion of privacy under either theory.  Hubacz has not pleaded any facts showing that Protzman intruded on any private space or seclusion that Hubacz created for his person or affairs.  *See id.* § 652B cmt. c. ("The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs.").  Nor has he pleaded facts showing that Protzman gave publicity to any aspects of private life.  *See id.* § 652D cmt. a. (explaining that the tort requires more than mere publication to a single person or even a small group of people).

For these reasons, Hubacz's claims against Protzman for invasion of privacy are also dismissed.

## IV. The Claims Against the Municipal Defendants Are Dismissed in Part

Initially, the Municipal Defendants moved to dismiss all of the counts in which they were named; however, in their reply memorandum, ECF No. 36 at *4-7, they withdrew their motion with respect to Counts V, VIII, and XII after acknowledging that this Court may entertain an on-the-record appeal of the village's termination decision.  *See* Vt. R. Civ. P. 75 (permitting

28

superior court review of decisions by state subdivisions); *City of Chicago v. International College of Surgeons*, 552 U.S. 156, 164 (1997) (holding that federal courts may exercise supplemental jurisdiction over on-the-record appeals of state administrative decisions).  The Municipal Defendants persist in their request to dismiss the remainder of the claims against them.  As explained below, the Court grants the Municipal Defendant's revised motion to dismiss with respect to all claims except for Count V (tortious interference) against Feccia and Shepeluk and Count VI (defamation) against Shepeluk.

### A.   Feccia and Shepeluk

Shepeluk and Feccia argue that they are entitled qualified immunity for Counts II, III, V, VI, VII, IX, and XIII.[5]  As discussed above, qualified immunity applies to claims under 18 U.S.C. § 1983 where a plaintiff fails to show that a violated a clearly established constitutional right.  *See, e.g., Pearson*, 555 U.S. at 232.  Under Vermont Law, qualified immunity provides similar protection against state claims.  *See Murray v. White*, 155 Vt. 621, 627, 587 A.2d 975, 978 (1991).  This Court has previously explained that

---

[5] For the sake of clarity, these counts include a claim against Feccia for violation of First Amendment and due process rights (Count II); against Shepeluk for violation of First Amendment rights (Count III); for tortious interference with contractual relations against Shepeluk and Feccia (Count V); for defamation against Shepeluk (Count VI); for whistleblowing against Shepeluk and Feccia (Count VII); for violation of the Vermont Polygraph Protection Act against Shepeluk and Feccia (Count IX); and for invasion of privacy against Feccia (Count XIII).

> to overcome the state law defense it is sufficient to show
> that the state employee's acts violated clearly established
> *state* law of which the employee reasonably should have
> known.  State law, of course, includes the common law of
> negligence.  Qualified immunity from tort liability will
> not be made to depend upon whether the tort has been
> codified.

*Wilkinson v. Balsam*, 885 F. Supp. 651, 664 (D. Vt. 1995)

(internal citations and quotations omitted).  For each count,

the dispute centers on whether Hubacz has pleaded facts giving

rise to the inference that Feccia and Protzman reasonably should

have known that they were acting in violation of clearly

established law.

### 1.   Count II Fails to State a Claim Against Feccia for Violation of Hubacz's Right to Informational Privacy

In Count II, Hubacz alleges that Feccia deprived him of his

federal constitutional right to privacy by disseminating the

Report to Kelly and Shepeluk, disseminating a DVD of Hubacz's

pre-polygraph interview to Shepeluk, and disseminating the

redacted Report to members of the media.  As explained above,

the core of Hubacz's informational privacy claim is against

Protzman, who conducted the interview, prepared the Report, and

distributed it to Feccia, among others.  There is no basis on

which the Court might infer that Feccia's distribution of a

Report and DVD of that interview violated a clearly established

constitutional right to informational privacy, particularly in

light of the fact that none of the facts alleged demonstrate

that he was asked a question that violates such a right.  For
that reason, the informational privacy claim against Feccia is
dismissed.

### 2. Counts II and III Fail to State Claims Against Feccia and Shepeluk for Retaliation in Violation of Hubacz's First Amendment rights

In Counts II and III, Hubacz alleges that Feccia and
Shepeluk violated his First Amendment rights by retaliating
against him when he raised concerns about other officers'
conduct at the WPD.  Hubacz shared his concerns with Feccia and
met with Shepeluk twice for a total of four hours, during which
he voiced his concerns about problems within the WPD, including
"numerous instances of sexual misconduct by WPD officers and
employees."  FAC ¶¶ 18-20.  Feccia and Shepeluk argue that
Hubacz's statements are not protected by the First Amendment
because he did not speak "as a citizen on a matter of public
concern."  *Garcetti*, 547 U.S. at 418.

"[W]hen public employees make statements pursuant to their
official duties, the employees are not speaking as citizens for
First Amendment purposes . . . ."  *Id*. at 421.  The Second
Circuit has joined other circuits in recognizing that "under the
First Amendment, speech can be 'pursuant to' a public employee's
official job duties even though it is not required by, or
included in, the employee's job description, or in response to a
request by the employer."  *Weintraub v. Bd. of Educ. of City*

31

*Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010).  Particularly when the speech at issue is "part and parcel of [an employee's] concerns about his ability to properly execute his duties," it is speech made pursuant to an official duty.  *Id.* (internal quotations omitted).  In *Platt v. Inc. Vill. of Southampton*, 391 F. App'x 62, 63 (2d Cir. 2010), the Platt claimed that Defendants had retaliated against him after he reported an allegedly improper relationship between two other officers in his department to a village trustee; however, the district court dismissed the claim on the grounds that Platt's discussion with the trustee was pursuant to his official duties as a police officer.  *Id*. at 63-64.  The Second Circuit acknowledged the possibility that improper relationships in the police department might affect public safety; however, it upheld the district court's dismissal of the retaliation claim. Hubacz's allegations are in substance identical to those dismissed in *Platt*; when he met with Shepeluk, he was speaking pursuant to his duties as a public employee rather than as a citizen on a matter of public concern.

Hubacz also asserts that Feccia violated his right to freedom of association; however, the Complaint does not allege that Feccia asked Hubacz any questions about his associations nor does it allege that Feccia subjected Hubacz to any adverse action as a result of Hubacz's associations.

32

For these reasons, Hubacz's First Amendment claims against Feccia and Shepeluk are dismissed.

> **3.  Count V States a Valid Claim Against Shepeluk and Feccia for Tortious Interference With Prospective Contractual Relations**

Hubacz alleges that Shepeluk and Feccia interfered with his prospective contractual relations with Montpelier after he interviewed with the MPD and received a tentative offer of employment from Chief Facos.  According to the Complaint, both Feccia and Shepeluk contacted their counterparts in Montpelier when they learned that Hubacz had interviewed.  Feccia contacted Facos to remind him that Vermont police chiefs had a tacit agreement not to steal each other's new hires, FAC ¶ 93, and Shepeluk contacted William Fraser, the Montpelier City Manager, and informed him that Hubacz was a liar because he would be breaking a three-year contract with Waterbury to go to the MPD. *Id.* ¶ 87.  Contrary to Shepeluk's alleged statement, Hubacz's contract with the WPD was not for a fixed term, though it did include a provision requiring Hubacz to reimburse the WPD for training costs if he voluntarily left within three years of joining. *See* Hubacz's Signed Offer of Employment, ECF No. 27-1. Both conversations occurred directly before Facos rescinded the tentative offer. *Id.* ¶ 90.

Under Vermont law, the tort of interference with prospective contractual relations is firmly established.  It

requires a party to demonstrate "(1) existence of valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an intentional act or interference on the part of the interferer, (4) damage to the party whose relationship or expectancy was disrupted; and (5) proof that the interference caused the harm sustained." *Howard Opera House Associates v. Urban Outfitters, Inc.*, 97 F. Supp. 2d 571, 575 (D. Vt. 2000) (citing *Gifford v. Sun Data, Inc.*, 165 Vt. 611, 612, 686 A.2d 472, 473-74 (1996)). The interference alleged must be both intentional and improper. *Williams v. Chittenden Trust Co.*, 145 Vt. 76, 80, 484 A.2d 911, 913 (1984) (citing Restatement (Second) of Torts § 766 (1979)).

Hubacz has pleaded facts creating an inference that both Feccia and Shepeluk tortiously interfered with his prospective business relationship with the MPD. According to the Complaint, Hubacz received a tentative offer of employment, both Feccia and Shepeluk knew of that offer, they took deliberate steps to get Facos to rescind the offer, and apparently succeeded. And although this issue was not well briefed by the parties, there is adequate reason to infer that the interference by both defendants was improper under well-established standards.[6] For

---

[6] In determining whether an actor's conduct in interfering with a contractual relation was improper, courts consider a litany of factors, including:

(a) the nature of the actor's conduct,

this reason, the Court denies the Municipal Defendants' motion
to dismiss with respect to Count V.

       **3.    Count VI States a Valid Claim Against Shepeluk
           for Defamation *Per Se* or Defamation**

     Hubacz also alleges that Shepeluk defamed him when he
called Fraser.  According to Hubacz, Shepeluk described him as a
"liar" because he was planning to leave before spending three
years with the WPD and falsely suggested that Hubacz had a
contractual obligation to remain at WPD for three years.

     Under Vermont law, the "elements of a private action for
defamation are: (1) a false and defamatory statement; (2) some
negligence or greater fault in publishing the statement; (3)
publication; (4) lack of privilege in the publication; (5)
special damages, unless actionable per se; and (6) some actual
harm." *Stone v. Banner Pub. Corp.*, 677 F. Supp. 242, 245 (D.
Vt. 1988) (citing *Lent v. Huntoon,* 143 Vt. 539, 546-47, 470 A.2d
1162, 1168 (1983)).  General, disparaging words are not
actionable *per se*, Restatement (Second) of Torts § 573 cmt. e.
Nonetheless, if such words cause special harm to the person

---

     (b) the actor's motive,
     (c) the interests of the other with which the actor's conduct
         interferes,
     (d) the interests sought to be advanced by the actor,
     (e) the social interests in protecting the freedom of action of
         the actor and the contractual interests of the other,
     (f) the proximity or remoteness of the actor's conduct to the
         interference and
     (g) the relations between the parties.

Restatement (Second) of Torts § 767.

defamed, such as the failure to realize a reasonable expectation
of gain, they may be the basis for an ordinary defamation suit.
As Comment b to section 575 of the Restatement explains,

> Special harm may be a loss of presently existing advantage,
> as a discharge from employment. *It may also be a failure to
> realize a reasonable expectation of gain, as the denial of
> employment which, but for the currency of the slander, the
> plaintiff would have received*. It is not necessary that he
> be legally entitled to receive the benefits that are denied
> to him because of the slander. It is enough that the
> slander has disappointed his reasonable expectation of
> receiving a gratuity.

*Id.* (emphasis added).[7]   Here, the Complaint identifies a general
but disparaging remark by Shepeluk that interfered with Hubacz's
reasonable expectation of employment with the MPD, a special
harm under section 575 of the Restatement.   Because those facts
are sufficient to give rise to a plausible claim for relief
under clearly established law, the Court also denies the
Municipal Defendants' motion to dismiss with respect to Count
VI.

### 4.   Count VII Fails to State a Claim Against Shepeluk and Feccia for Common Law Whistleblowing

Count VII alleges that Shepeluk and Feccia punished Hubacz
by docking him 56 hours of paid vacation time for expressing his
concerns about employee misconduct taking place at WPD.   FAC ¶
512.   According to the Complaint, despite having cleared Hubacz
of the charges of cheating at the VPA, $10 in excess insurance

---

[7] The Vermont Supreme Court has previously relied on the comments to this
section.  *See Lent*, 470 A.2d at 1167-68.

proceeds, and his taking of police uniforms, Feccia and Shepeluk nonetheless disciplined him for sharing his criticisms of WPD officers and employees with Protzman and Kelly. *Id.* ¶¶ 245-46.

To state a claim for retaliatory discharge, a plaintiff must allege facts showing "(1) participation in a protected activity known to the defendant, (2) an employment action disadvantaging [the plaintiff], and (3) a causal connection between the protected activity and the adverse employment action." *Regimbald v. Gen. Elec. Co.*, 2:05-CV-161, 2007 WL 128963 at *3 (D. Vt. Jan. 12, 2007) (quoting *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir. 1998), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002)); *see also Robertson v. Mylan Laboratories, Inc.,* 176 Vt. 356, 376 (2004). Hubacz has pleaded facts showing that Feccia and Shepeluk disciplined him for expressing his concerns about officers' conduct at the WPD to Kelly and Protzman; however, neither Feccia or Shepeluk would have known that Hubacz's activity was protected under clearly established law. This Court has previously recognized that whistleblowing is a protected activity, *see, e.g., Regimbald,* 2007 WL 128963 at *3; however, the scope of common-law whistleblowing is ill-defined. Reference to whistleblowing statutes from other jurisdictions only weakens Hubacz's argument: most whistleblowing provisions appear to require specific dangers or violations rather than

simply accusations of mismanagement to qualify for protection. *See, e.g., Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 268 (S.D.N.Y. 2001) (New York's whistleblower act protects those who report "violations of any law, rule or regulation which 'creates and presents a substantial and specific danger to the public health or safety.'") (quoting N.Y. Labor Law § 740(2)(a)); *Flores v. Dept. of Treasury*, 25 F. App'x 868, 870 (Fed. Cir. 2001) (describing whistleblowing as reporting the "violation of law, rule or regulation, gross mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety").

Because Count VII fails to allege facts giving rise to a claim for common law whistleblowing against Feccia and Shepeluk under clearly established law, Count VII is dismissed.

> **5.   Count IX Fails to State a Claim Against Shepeluk and Feccia for Violation of the Vermont Polygraph Protection Act**

Count IX alleges that Shepeluk and Feccia violated the anti-retaliation provision of the VPPA, Vt. Stat. Ann. tit. 21, § 494d, by disciplining Officer Hubacz for filing complaints alleging violations of the VPPA.  Although the Complaint states that Hubacz filed a formal objection with the Vermont State Police about the pre-polygraph interview, the Complaint contains no facts, apart from the conclusory allegations in Count IX, creating an inference that Hubacz suffered adverse consequences

for doing so.  Under Vermont law, the mere fact that Hubacz was terminated by the Village within months of filing an objection to the way the interview was conducted is insufficient to establish a prima facie case for retaliation.  *See, e.g., Robertson v. Mylan Laboratories, Inc.*, 2004 VT 15 ¶ 47, 176 Vt. 356, 378, 848 A.2d 310, 329 (citing *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990) (proximity in time of three months between the protected activity and the adverse action is alone insufficient to make out a prima facie case for retaliation)).  For this reason, the VPPA claim against Shepeluk and Feccia is dismissed.

### 6.   Count XIII Fails to State a Claim Against Feccia for Invasion of Privacy

Count XIII of the Complaint alleges that Feccia invaded Hubacz's privacy by distributing the Report to Kelly and Shepeluk, distributing the DVD of the interview to Shepeluk, and distributing the redacted Report to the media.  To state a claim for invasion of privacy, Hubacz must plead facts showing that Feccia intruded upon his seclusion or gave publicity to highly private information.  *See Harris*, 165 Vt. at 439; Restatement (Second) of Torts § 652D.  The Complaint does neither.  Hubacz presents no facts suggesting that Feccia intruded upon his seclusion.  And, as explained above, the publicity required for invasion of privacy contemplates more than mere publication of

information to a third party; the term requires that the matter
be made public "by communicating it to the public at large, or
to so many persons that the matter must be regarded as
substantially certain to become one of public knowledge."
Restatement (Second) of Torts § 625D cmt. a.  Feccia's
distribution of the DVD and the Report to Shepeluk and the
Report to Kelly is insufficient to meet that standard.  Although
distribution of the redacted report to the media might very well
meet the requirements for establishing publicity, the redacted
report did not contain private information that if publicized
would be highly offensive to a reasonable person.  *See* Redacted
Confidential Pre-employment Polygraph Examination Report, ECF
No. 27-4.  For those reasons, Hubacz's claim against Feccia for
invasion of privacy is dismissed.

### D.   Counts V, VI, VII, IX and XI Fail to State Claims Against Waterbury

The Municipal Defendants also seek to dismiss Counts V, VI,
VII, IX, and XI against Waterbury because the Village is
entitled to municipal immunity.[8]

Vermont courts have long recognized the doctrine of
municipal immunity.  *See Baxter v. Winooski Turnpike Co.*, 22 Vt.
114, 123 (1849) (explaining that the law does not provide remedy

---

[8] Count V alleges tortious interference with contractual relations;
Count VI for defamation; Count VII for common law whistleblowing;
Count IX for violation of the Vermont Polygraph Protection Act
("VPPA"); and Count XI for reversal of the village's decision on the
grounds that it is arbitrary and capricious.

where individual sustains injury due to negligence of a town).
But municipalities are "liable only where the negligent act
arises out of a duty that is proprietary in nature as opposed to
governmental." *Hillerby v. Town of Colchester*, 167 Vt. 270,
272, 706 A.2d 446, 447 (1997).  "Despite the recognition that it
is in the distinct minority, the Vermont Supreme Court has
continued to apply this distinction, reasoning that in
performing governmental functions, municipalities act as
instrumentalities of the State and do so for the general
public." *Gretkowski v. City of Burlington*, 50 F. Supp. 2d 292,
294 (D. Vt. 1998) *aff'd sub nom.*, 181 F.3d 82 (2d Cir. 1999)
(citing *Hillerby*, 167 Vt. at 272-73, 706 A.2d at 447; *Hudson*,
161 Vt. at 177 n. 3, 638 A.2d at 568 n.3).  Although the
distinction between governmental and proprietary functions is
sometimes difficult to apply, this Court has already cast aside
that concern in this context and concluded that "police work is
a quintessential governmental function." *Decker v. Fish*, 126 F.
Supp. 2d 342, 346 (D. Vt. 2000) (citing *Clain v. City of
Burlington*, 202 F.2d 532, 533 (2d Cir. 1953) (categorizing
"protection against violence and fire" as non-proprietary (i.e.,
governmental) functions of municipalities)).  The common law
claims brought by Hubacz for tortious interference with Hubacz's
contractual relations, defamation, and whistleblowing all arise
out of the internal affairs of the WPD.  Since management of a

41

police department is quintessentially governmental, not proprietary, municipal immunity clearly precludes action against Waterbury on those claims.[9]

The applicability of municipal immunity is more complicated with respect to Hubacz's claim that Waterbury violated the VPPA (Count IX). The fundamental issue is whether Vermont's common law municipal liability is abrogated by a statutory right of action.[10] The VPPA regulates polygraph examinations administered by employers, including "any individual, organization, or governmental body . . . which has one or more individuals performing services for it within this state" and creates penalties for violators of those regulations. Vt. Stat. Ann. tit. 21, § 494a, 494e. Nonetheless, the VPPA is silent with respect to its impact on common law municipal immunity. Where, as here, a statute does not clearly abrogate a well-established immunity, this Court is loathe to make such an inference. *See* 18 Eugene McQuillin, *The Law of Municipal Corporations* § 53.76 (3d ed. 1993) (enactments imposing municipal liability in derogation of the common law are strictly construed); *cf. Owen v. City of Independence, Mo.*, 445 U.S. 622, 667 (1980)

---

[9] Hubacz has not alleged, nor is there any indication that Waterbury has liability insurance that would waive its immunity under Vt. Stat. Ann. tit. 29, § 1403.

[10] The issue of whether statutory rights of action abrogate common law municipal immunity was not addressed by either of the parties, and to the Court's knowledge, there is no Vermont Supreme Court case discussing the matter.

("[I]mmunities well grounded in history and reason were not abrogated by covert inclusion in the general language of § 1983.") (internal quotations omitted).

Finally, Count XI alleges that Waterbury's decision to terminate Hubacz was "arbitrary, capricious, unconstitutional and contrary to law and should be reversed."  FAC ¶ 533.  In the absence of any language clarifying the nature of these claims, the Court interprets Count XI as a request to reverse Waterbury's decision to terminate Hubacz on the legal grounds stated elsewhere in the Complaint.

For these reasons, the claims contained in Counts V, VI, VII, IX, and XI against Waterbury are dismissed.

## CONCLUSION

The Court grants Kelly and Protzman's motion to dismiss in full.  The Court also grants the Municipal Defendants' motion to dismiss except with respect to Count V (tortious interference) against Feccia and Shepeluk and Count VI (defamation) against Shepeluk.  Because the Municipal Defendants withdrew their motion to dismiss with respect to Counts VIII and X against Waterbury and Count XII against Feccia, those claims also remain.

Dated at Burlington, in the District of Vermont, this 4th day of April, 2013.

/s/William K. Sessions III
William K. Sessions III
U.S. District Court Judge